We'll turn to our second case for argument today, which is Diamond v. W.R. Berkley Corporation. It is docket 21-1331. Mr. McCurdy, please proceed when you're ready. May it please the Court, good morning. I'm Sean McCurdy, Counsel for Appellant Diamond. The record in this case shows that Diamond was the Vice President of Professional Lines at Berkley with more than 30 years' experience. He worked for Berkley in the same position for over eight years without any corrective action. He always met or exceeded Berkley's expectations and his Professional Lines sector was always profitable. Then in June 2019, Diamond turned 60 and Berkley's President, Edwards, became his supervisor. Edwards is more than 16 years younger than Diamond. Edwards then worked to manage out Diamond with an impossible task list and replace him with his subordinate, Austin, who is approximately eight and a half years younger than Diamond. After Diamond made several ADA complaints about Edwards to HR, Edwards promptly decided to terminate Diamond and promote Austin into his position just as Diamond had complained. Berkley's explanation for the termination involves an insurance policy underwritten by Diamond for a law firm. Specifically, in prior acts. Everything Diamond did in offering policy terms to the law firm was entirely appropriate. Why did he apologize, then? Well, Your Honor, he did not apologize. He apologized for missing the comma that was missing from the instructions. He actually apologized for not catching a missing comma. He didn't apologize for improperly writing the policy. Was that at the time that he apologized? He talked about the comma? No, Your Honor. When it came to light that there was a problem with the matter, as a preventative measure, he was humble and self-reflective. He wrote an email to his supervisor and he apologized for overlooking that fact that the comma was missing. He actually talked about the missing comma in the email where he apologized? I believe he, I would have to look at the record, but I believe he apologized for that being the issue. Okay. Are you contending it's the usual course of business to insure an attorney who has been dropped by a previous carrier for the number of claims and have that go back in time, years? Everything that Mr. Diamond did on writing the policy and offering the different terms and taking a second look and receiving additional information, everything was reasonable and appropriate. Yes, Your Honor. However, when binding... Well, let's talk some more about that because that's really what this case seems to be about is whether that, I mean, obviously the company says that was an intervening event that was significant and they point to their policy, which I'm not, we're not policy by a standard, that requires before you can have retroactive coverage, you have to get a no-loss statement, which makes total sense and that's the whole idea, I assume, of not insuring a burning house as they say. Yes, Your Honor. And that never happened here. It actually did, Your Honor. How is that? I'm sorry. In the application itself, there was a no-loss provision and in fact, the no-loss provision is what allowed Berkeley to eventually deny the claim for the proper reason in that the insured had prior knowledge of the claim and didn't disclose it in the application. So the underwriting guideline was followed to a T. Well, I didn't understand that to be your position, that the underwriting, sorry, that the underwriting guideline was followed to a T. The company certainly seems to dispute that there was any independent no-loss statement. I don't know, independent, there was a provision. All right. So maybe we're talking about the same thing. Maybe that's what they're talking about. And importantly, Your Honor, Berkeley's President Edwards admitted at the time she can appreciate how the accident was made around misinterpreting the wording from the agent on the binding instructions. So at the time, Berkeley's President accepted that that was a simple, minor error and not an intervening act that would break the causal connection. The first error that the company says that Mr. Diamond made was that he ever even agreed to write any policy, as I understand it, because this law firm was outside the preferred risk profile. Yes, Your Honor. Can you address that? Certainly, Your Honor. It's not uncommon to take a second look in the industry if the information, which is exactly what happened, the insured had a high claims, a number of claims on his previous policy, and that's what brought it outside of the... I'm not asking if it's uncommon or if they sometimes do it. I'm asking it, asking you, was this outside the preferred risk profile? No, it wasn't, Your Honor. Claims were written in New York City. There wasn't any strict regulation requiring him to not write this policy. It was a judgment decision, and as the vice president over professional lines, he had that independent judgment, and everything was reasonable and appropriate in writing the policy, and it was agreed by President Edwards that she understood how that mistake could be made. Well, you characterize it as a mistake, and of course, we have a full record here which we can review, but if the employer thought that Mr. Diamond had screwed up here, that would... And you disagree with that, and Mr. Diamond disagrees that he did. Would that even matter? Because what really matters is whether the employer really believed what it was saying as far as the pretext goes, correct? It really wouldn't matter, Your Honor. It was clear upon a basic review of the file that the policy was corrected and not backdated. Simply looking at the emails which are in the record now, one can see that the policy was corrected, it was requested to be corrected, and it was never backdated. Nonetheless... Let's talk about that term backdating. It's not really what happened here. It wasn't like it was just backdated. He'd already issued a policy, or Mr. Diamond had issued a policy with the normal effected from a particular date forward, correct? That's correct. So in order to make this policy retroactive after the fact, didn't he have to add something, a writer or something? It wasn't just like a technical correction. What actually happened? Let's say backdating, what does that mean? Well, in this, it is like an actual writer. The policy was amended to reflect the actual terms that were already purchased. That is what was clear, is that when the policy was Well, I understand that they've been purchased, but the question is whether he had authority. It's no different to issue a writer with retroactive coverage than it is to issue a retroactive coverage policy in the first instance, is it, in terms of whether he had authority or not. We're not talking now about whether it's caused the company any harm or anything down the road, but we're talking about his authority to issue retroactive coverage at this point. Yes, and he had that authority. And the important aspect is that the writer was a correction of the previously offered, accepted and purchased policy. So the contract was already in effect in November, by November 14th of 2019. And when it came to light that there was simply an error in binding the policy, the wrong term was bound, the writer was the remedial action to correct the policy, not to write a whole new policy or to provide coverage that hadn't been purchased or to backdate. It was to correct the policy to what had actually been purchased so that Mr. Diamond didn't engage in bad faith by providing the coverage, by not providing the coverage that was actually purchased. He was required under Trinity versus Tower and under Colorado law to not engage in bad faith against Berkeley's insured. He had to correct the policy. It was fully within his authority. Let me just make sure I understand what you're saying. Are you saying that the policy that ultimately became in force is the policy that Mr. Diamond intended to issue at the very start? Correct Your Honor. And the record bears that out? Correct Your Honor. November 14th, the emails and Mr. Sylvester's testimony both confirmed that as of November 14th, 2019, the policy terms had been offered, accepted, and purchased when binding the policy. About a week later, Mr. Diamond bound the wrong option because of the missing comma. And when it was brought to his attention, he did the right thing, the thing that Berkeley's policy and the law require him to do, and that is provide the coverage. And importantly, Mrs. Edwards recognized that it was a simple binding error and she wrote, I understand. It's an understandable error. That's why we say it's a minor correction, which happens quite often in the industry. The important part is that you do what Mr. Diamond did and you correct it promptly so that you provide the coverage to the insured that was actually purchased and don't engage in bad faith. Can I ask you another question? I found the underwriting guideline that I was looking for. It unequivocally states coverage should never, and the word never is used, be put in place retroactively, which is what happened here. Regardless of whether this was his decision in the first place or whether it was a mistake, he did eventually issue retroactive coverage without a no-loss statement or other evidence of past loss history. So I would like you again to tell me what you think a no-loss statement is in that provision, in their underwriting guidelines, which he obviously was quite familiar with. Yes, Your Honor. In the initial application that the law firm signed Is that in the record, that he believes that that's what a no-loss statement is? I don't believe that application is in the record. However, it does just make common sense. That was the reason that Berkley was able to deny the claim eventually after I don't want common sense here. I want to know what he thought a no-loss statement was and whether he had that and was authorized under this guideline to issue retroactive coverage. Yes, Your Honor. He thinks that the no-loss statement was in the application. And where did he testify to that? I believe that's in the record in many different respects, in that both Mr. Diamond and Mr. Sylvester testified that there was no backdating of the policy. The retroactive coverage was offered at the very beginning on November... Yeah, I understand all that. I get the part about what was offered and what eventually got issued and what eventually got corrected. What I'm trying to get is why he thought he had authority when this says coverage should never be put in place retroactively. I'm trying to get at what a known no-loss statement is. And I presume it's something, if the company is going to issue a retroactive coverage, they want some significant confirmation, probably verified affidavit type confirmation, saying that the individual or the company is not aware of any losses at this point. Because then when a loss comes in, as it did here, quickly... And that provision is in the application that the law firm signed. And so when the underwriting guidelines refer to a known no-loss statement, it's nothing separate. It's nothing unusual. Everybody fills it out at the end. If the application is signed, yes, Your Honor. Counselor, before you move on, can I just ask you to address the issue of pretext? Yes, Your Honor. There's sufficient evidence of pretext in the record in at least five major ways. The backdating excuse for termination was false. And that's clear in the record. It was a correction, not a backdating. There was no investigation of Mr. Diamond's ADEA complaints, which was required by Berkeley in their policy, and they blew off that requirement. That's evidence of pretext. There's comparator evidence, as Mr. Austin was eight and a half years younger, and he was replaced after losing nearly a million dollars on a single policy. Mr. Diamond was terminated when the law firm policy made a profit. What did that policy have to do with anything? Was that a policy that Mr. Austin issued without authority or that was issued without a no-loss statement? No, Your Honor. It was just a single policy with a massive loss. So how is that a comparator? So it shows that Mr. How is that a comparator to this? It shows that Mr. Austin engaged in something that cost Berkeley nearly a million dollars. That's not a comparator. What they say they terminated him for is issuing a retroactive policy without any loss statement, contrary to the guidelines. So is there any information in the record that would have any similar comparator where did they ever, did someone do this? Mr. Diamond himself, did he show instances where he issued retroactive coverage without a loss statement and wasn't obviously disciplined? No, Your Honor. The comparators don't have to be exact duplicates. I believe the law requires us to look at the relative significance of the differences, and certainly this losing a million dollars compared to making a profit on the loss policy. No one ever said they terminated his employment for losing money. They terminated him for violating this mandatory underwriting guideline. So I guess I'm not following how it's a comparator. Policies do lose money. I mean, there's claims on them. They lose money. And certainly Berkeley's reasons have grown and expanded and changed over the course of this litigation. Thank you, Your Honor. Good morning. May it please the Court? Opposing counsel? My name is Susan Elgin. I represent the But I'd like to talk to you today about are the words, but for. The record in this case establishes that Mr. Diamond's employment was not terminated because of his age or because of retaliation, but rather because he exercised poor judgment in handling an insurance policy. Mr. Diamond admits to this. Look at paragraph 12 of his opening brief. He states that when binding the policy, the law firm purchased, Mr. Diamond initially bound the wrong term option. Paragraph 13 of his opening brief, he states that he apologized for misinterpretation of the broker's binding instructions and told his boss, Marlo Edwards, that he was trying to do too many things at once and going too fast. These mistakes are the result of poor judgment and it eroded the confidence that company leadership had in him to do the job. Mr. Diamond intentionally disregarded company policies, and his own statements show his willful and knowing misconduct. Mr. Diamond's mistakes and then his attempt at a cover-up support his employment termination. He breached his duty to the company. But for is the highest standard in employment cases. There is not a shred of evidence in the record linking Mr. Diamond's employment termination to his age. By cover-up, do you mean his not just telling his supervisors or do you mean he actively covered up? No, that's correct, Judge. He did not talk to his supervisors about this. He didn't talk to the claims department. He didn't do anything that he was supposed to do under the policy. Mr. Diamond cannot show that but for his age, he would still be working at Berkeley. He would still be working at Berkeley. Rather, it is but for his own admitted mistakes and misconduct that his actions merited his discharge. At the time his employment was terminated, what was the reason given? Sure, the reason that was given to him was his mishandling of the law firm matter. In general or something specific? No, it was a general statement that it was his mishandling of the law firm matter. What was he to understand that meant, mishandling? They had discussed with him his mishandling of the matter, how the claim came in and how we should have handled that. How should it have been handled? What was the problem? In the brief, it goes through several mistakes that Mr. Diamond made. Initially, issuing it at all. He should not have originally issued the policy that was outside of Berkeley's preferred risk profile. He got pushed around by the broker. The broker asked him... Let's talk about that part first. That's the first reason you list in your brief is outside the risk profile. Did he have the authority to issue a policy outside the risk profile? It exhibited poor judgment. That's not what I'm asking you. Sure. If he had the authority, why is that something that you would terminate him for after... Talking about somebody that had been there for eight years and had been in the industry 30 years, if he had a single instance of poor judgment, why would that have been significant? I think there were multiple instances of poor judgment in this case. He wasn't fired for only issuing the policy. He was fired for everything that came after that as well. Let's talk about that then. Because that's what you've got to show is that somehow that reason that you gave is the legitimate, non-discriminatory reason and it wasn't something else. At this point, he's recently filed three age discrimination complaints within the span of about three weeks, or two and a half weeks. Yes. And this happens. Yes. This is the intervening event. This comes after Mr. Diamond has spoken with Ms. Heifel about those. And this is anything that breaks that cause. Let's go to the second reason that you list in your brief. The first was the part about the risk, but you're saying he did have authority to do that. It was just a lack of judgment. Okay. What about the second reason you give, which I think is that he should never have given these two options to begin with. Yes. It's that he claims that he misread the policy or that he misread the instructions from the broker. But yes, he issued the policy incorrectly. If he had issued it correctly, maybe we wouldn't be here today. Okay. That's the part I want to focus on because I'm misunderstanding your argument then in your brief. I thought you were arguing that he didn't have authority to even issue the options or to eventually do the rider because there was no proof of law statement. Correct. This is retroactive coverage. Yes. Before he could issue retroactive coverage, he needed a no law statement. But he suggests that the no law statement was there in his application, in the law firm's application. Is that correct? No. There is no evidence in this record that Mr. Diamond ever obtained a no law statement. What is he referring to when he talks about, I assume it's a form, an application. Quite frankly, Judge, I don't know what he's referring to. A no law statement from Berkeley would be something separate, right? It would be something outside of an insurance policy or insurance application. The W.R. Berkeley underwriting guidelines that refer to needing a no law statement, that's something above and beyond something that is issued in every single insurance policy or application. It wouldn't be in there if it was something that just kind of went part and parcel with every insurance policy. All right. Did he even have the authority without getting this no law statement to issue an option for coverage, retro coverage? I don't think there's any evidence in the record that would show either way. Ultimately, I think, you know, before he could issue that, he needed a no law statement. That's where I'm, that's what I'm trying to get to. So eventually he issues it and he issues not the one that, not the retroactive. And it's his assistant who tells him that there's this mess up. And so he corrects it with a rider. That's correct. What should he have done? What is the company's position that he should have done at this point? Because he's, he's already agreed to retroactive coverage without a law statement. So what should he have done at this point? Sure. He should have done a couple of things. First, he should have asked the broker, the insured, for a no law statement. He needed to obtain that. Even after he'd already issued the option of retro coverage and just mistakenly not go with it. Was that still an option at that point? Yes. I believe Merle Edwards had... Could it have been corrected in the sense that it never would have been issued as a retroactive policy? Yes. He should have notified the claims department. He should have notified them that this had happened. Instead, the claims department first found out about this when they received a no on the policy, which they denied because they didn't know that a retroactive endorsement had been issued on this policy. He should have talked to his supervisor, Ms. Edwards, and sought counsel on how to handle this. He could have done a number of things rather than just issue the retroactive endorsement without a second thought. Was there any evidence that he or anyone else had ever issued a policy retroactively without a known law statement? No, Your Honor. There are no comparators in this case. There's no evidence in the record that anyone at Berkeley had ever done this before. I think we covered Berkeley's legitimate, non-discriminatory reason for Mr. Diamond's discharge. I would like to touch briefly on the issue of pretext. Under the ADEA, Mr. Diamond must show that his age was the but-for cause of his termination. This is a more difficult standard than Title VII's motivating standard. With but-for causation, he must show that for his age, he would still be working at Berkeley. Mr. Diamond went through several ways that he believes that he can show pretext, but the district court correctly determined that none of those allegations can meet Mr. Diamond's burden. He has to show that Berkeley's reason was untrue and that age discrimination was the real but-for cause of his employment termination. When looking at this, the court doesn't second-guess the business judgment of the employer. You don't even need to analyze whether Berkeley was wise or fair or correct for the reasoning. Rather, just whether or not they honestly believed the reasons for the employment termination. Ultimately, that's what all of Mr. Diamond's arguments boil down to, second-guessing Berkeley's business judgment, something that the court doesn't do. Was it relevant to pretext that all these things had been going on just in the few weeks before? Clearly, Edwards, his supervisor, was unhappy with his performance, had given him a task list, had sent him emails, very unhappy emails about his performance, had requested to meet with him. That hadn't happened for various reasons. He had made the informal complaints. All of this had just happened within weeks. Is that relevant to pretext in this instance? I think the record shows that Mr. Diamond had had some performance issues and that they were working through those performance issues. I briefly described the law for matters, sort of the culminating event that led to Mr. Diamond's employment termination. He had had some trouble leading up to that. But not until this new supervisor came just a few months before, was there any record, any history, at least, in his files for the past eight years of any issues? His employment evaluations in the prior eight years were not stellar. I would describe them as average. There were definitely things that his prior supervisor had identified that he needed to improve on. Miss Edwards was really and she had higher standards for Mr. Diamond and everyone at Veris. She was tasked with turning around that company. I think it's important that this case lacks many of the hallmarks that you would see in an employment, in an age discrimination employment case. In this case, all of the decision makers are in Mr. Diamond's same protected class at over 40. In addition, there's no evidence of any ageist remarks, any stray comments, anything like that. It doesn't really matter. I think we're talking now about a prima facie case now, I guess, but it doesn't really matter that the person who replaced him was in a protected class. He was younger. Or that some of the management folks that were involved were in a protected class. That's not necessarily, doesn't prohibit him from arguing that that's some evidence. Yeah, that's correct, Judge. I do think it cuts against any finding of pretext, though, that they did share that same protected class. And I'll talk about Mr. Austin quickly as well. So Mr. Austin was the individual who ultimately replaced Mr. Diamond. That happened six months after Mr. Diamond's employment termination, following an external search that the company conducted. Mr. Diamond predicted in his complaints that it was going to happen, that that's who was going to replace him, and that he suggested that was his supervisor's goal, was to replace him. He did suggest that. Ultimately, Mr. Austin was promoted into that position by the company's COO, Ms. Donna Pyle. Ms. Edwards was not the decision maker on that decision. Mr. Edwards had been with the company as long as Mr. Diamond had. He was experienced, and Mr. Diamond even testified that Mr. Austin was an excellent employee. I think all those things cut against any kind of finding of prejudice. I see I have a minute left, so I will wrap up here. Thank you for your questions today. The District Court's decision in this case, I think, was thoughtful and well-considered. On behalf of the Appalachians, I ask that you affirm the decision and dismiss this case with prejudice. Thank you.